

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-19-00745-CR

Miguel G. **MARTINEZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 437th Judicial District Court, Bexar County, Texas
Trial Court No. 2015CR4203
Honorable W.C. Kirkendall, Judge Presiding[1]

Opinion by:  Luz Elena D. Chapa, Justice

Sitting:  Rebeca C. Martinez, Chief Justice (concurring in judgment without opinion)
Luz Elena D. Chapa, Justice
Liza A. Rodriguez, Justice

Delivered and Filed: August 31, 2022

AFFIRMED

Miguel Martinez was convicted by a jury of murder and sentenced to life in prison and assessed a $10,000 fine. He seeks reversal of the judgment, arguing the trial court erred by denying him a continuance, failing to suppress records from his cell phone provider, and denying his request for a jury instruction regarding the voluntariness of his statements to police. We conclude the record does not show reversible error, and we therefore affirm the judgment.

---

[1] Senior Judge, sitting by assignment

**THE EVIDENCE AT TRIAL**

At dusk on the evening of January 11, 2015, fourteen-year-old Luis Castillo went outside his house on Arrid Street in San Antonio to find out why his dog was barking and to feed it. Outside, Castillo saw a silver Honda pull up in front of the vacant house next door with the driver's side next to the curb, facing away from him and toward the end of the dead-end street. The car was parked across the street from a large park. An illuminated street light was next to the car. Castillo testified he saw a light-skinned Hispanic male in his late twenties or early thirties wearing a dark hoodie get out of the passenger side of the car and start "messing around with" his pockets. Castillo went back inside to get the water for the dog, and when he returned, the same person was back inside the car with the door closed. Castillo did not see who sat in the driver's seat.

Castillo went back inside the house to have dinner with his grandmother. Within a few minutes, they heard five or six loud gunshots. They both got low to the ground, and Castillo's grandmother went to the other room and called 911. She testified all she could see out the window in that room was the parked car. Castillo testified he first went and looked out a window. A minute or two later, he went and peeked out a door on the side of the house, where he saw a white van with a decal on it speeding away up Arrid Street.

San Antonio Police Department (SAPD) Detective Michael Wehe was a patrol officer at the time. He testified he received a report of gunshots fired at 6:51 p.m. and responded to the call. When he arrived, he saw a car parked on the side of the street with the lights on and the passenger door open. There was a female in the driver's seat who appeared deceased. A wallet was found on the floorboard on the front passenger side of the car and a purse in the back seat. The victim was preliminarily identified from the driver's license in the wallet as Laura Carter. Her identity was later confirmed.

A doctor with the Bexar County Medical Examiner testified the victim had five gunshot wounds to the right side of her head and ruled her death a homicide. The investigators testified they found bullet holes in the driver's side window and the interior of the driver's door. They recovered bullets and fragments from the driver's side door and window and from the yard. Edward Wallace, an expert firearms examiner with the Bexar County Criminal Investigation Laboratory, testified he received four fired bullet jackets, one fired bullet, and three bullet cores, but he never received a firearm with which he could compare the fired bullets. Nevertheless, he was able to examine the fired bullets and determine the caliber of firearm used to fire them, what kind of firearm could have been used to fire them, and whether they were fired from one or multiple guns. He testified that his examination disclosed that all the bullets were .38 caliber class and were fired from the same weapon, a revolver.

Mark Duke, a homicide detective with the SAPD, was assigned to respond to the scene. After interviewing Castillo and his grandmother, Detective Duke contacted and met with Carter's parents. Her identity was confirmed; she was a thirty-three-year-old student working on her master's degree at the University of Texas at San Antonio. Her father testified he and his wife provided Detective Duke a list of her friends and acquaintances and told the detective she was on his cell phone plan, so he had access to a record of her calls. He printed a log of her calls and texts from the day she was murdered. Her parents and sister identified to whom all but one of the telephone numbers belonged. She had communicated with the unknown number earlier that day and then several times within the hour before the 911 call. Detective Duke learned the unknown number belonged to a Verizon account, but he was unable to discern the name of the person who held the Verizon account using databases to which he had access. He then spoke with many of the victim's friends, but was still unable to identify the owner of the Verizon telephone number.

On January 13, one of the friends Detective Duke talked to was Courtney Mills. Mills testified at trial that she and the victim had known each other since junior high school and had been best friends since college. She testified they started abusing prescription painkillers about six years before the murder. Mills admitted she occasionally used heroin with the victim. Mills identified Martinez at trial as a heroin dealer and testified she and the victim had driven together a number of times to purchase heroin from him. She testified that most times they met Martinez in a parking lot by the Panda Express off Interstate 37 at Southcross. They would back the car into a parking space and Martinez would park his truck a few spaces down; then Carter would go over to the truck, get in and do the deal, and return to the car.

According to Mills, Carter was frustrated with not having enough money to support herself while she finished her graduate degree. In December 2014, she told Mills that Martinez had approached her with a business proposition whereby she would invest $1,500 of her student loan funds with him. He would use it to buy and then resell heroin, and they would split the profit. She believed if she did this eight to ten times, she would cover all of her living expenses; she told Mills she "was going to do this deal."

Detective Duke testified Mills told him during the January 13 interview that she and the victim periodically bought heroin from Martinez and shared details about the "business deal" Martinez had proposed to Carter a month earlier. Detective Duke later obtained Carter's bank records, and a Frost Bank employee testified that her account received a $9,680 direct deposit from UTSA on January 6, and she withdrew $7,000 cash from the account on January 8.

On January 14, Detective Duke applied for and obtained a warrant for the subscriber information for the unknown Verizon telephone number and for the communication logs and historical tower data for the number during the period of November 1, 2014 through January 14, 2015. Detective Duke received a return on the warrant from Verizon on January 18. The return did

not identify a subscriber; rather it stated the number was assigned to TracFone Wireless. Detective Duke testified such a cell phone can be purchased and activated without providing identification or a real name; he referred to it as a "burner phone." Detective Duke testified the return nevertheless provided valuable information. First, the detective showed the cell tower data to an FBI technician, who told him the device had been near the crime scene at the time of the victim's murder. Second, the call logs made known to him people's telephone numbers, including Carter's, who the owner of the unknown Verizon telephone number had been in contact with around the time of the murder. The call logs showed multiple calls and texts with a number the Detective discovered belonged to Gregory Dalton.

When Detective Duke went to visit Dalton the next day, Dalton arrived at the house in a white van with a large decal on the side, consistent with description of the van Castillo saw leaving the murder scene. Detective Duke testified Dalton tried to get rid of some marijuana he was holding and flee, but he was stopped and arrested for possession of marijuana. Detective Duke interviewed Dalton that day over the course of six hours. Detective Duke testified Dalton originally was "not forthcoming"; that Dalton was not telling him the whole truth; and that he concluded "Dalton is, in fact, a liar." He testified he used a variety of interview techniques with Dalton, including loud, aggressive, and accusatory language, lying, and leaving him alone for long periods of time. He also selectively provided Dalton information he had already confirmed in an effort to encourage Dalton to start telling him the truth. Detective Duke testified Dalton ultimately identified Martinez as the owner of the unknown Verizon telephone number and told him the version of events Dalton testified to at trial. Detective Duke believed most of what Dalton ultimately told him was the truth because some of the details Dalton disclosed were consistent with the facts he already knew and because he was later able to corroborate some of the new information Dalton provided. Detective Duke testified he did not believe Dalton to have been the person with the victim in the car before

the shooting because Dalton did not match the description of the person Castillo described: a Latin male with facial hair in his twenties or thirties.

Dalton testified he had known Martinez several years before the murder. Dalton detailed Martinez's vehicles and Martinez sold him drugs. He testified that on the afternoon of January 11, 2015, Martinez asked Dalton if he could give him a ride later that day. Dalton testified Martinez told him he needed a ride from Southside Lions Park to the Taco Cabana on Interstate 37, and it would not take long. Martinez was to text Dalton the address later. Martinez said he would give Dalton some marijuana in exchange, and Dalton agreed.

Dalton testified it was getting dark when he received a call from Martinez letting him know he was ready to be picked up. Martinez sent him a text with an address and then contacted him several times to make sure he was on his way. Dalton testified he drove his white work van, which has a large decal and his phone number on the side of it. He testified he followed the directions his GPS gave him and was looking for Martinez's white Ford F-150 King Ranch truck, but did not see it. Dalton's testimony about which streets he took once he got to the neighborhood by the park, where he was when he heard gunshots, and where he was when he received further texts and calls from Martinez was inconsistent. Dalton, however, consistently testified he got to the neighborhood and drove around looking for Martinez's truck, he received texts and calls from Martinez both before and after hearing gunshots, and then he found Martinez on Arrid Street. He testified Martinez denied having anything to do with the gunshots Dalton had heard and that he did not see a gun or any blood on Martinez. Martinez told Dalton to "haul ass" and directed him to Martinez's house on Polydale. When they got to the house, Martinez got out of the van, but then turned around and got back in, saying he needed to pick something up for his girlfriend at Taco Cabana. Dalton testified he drove Martinez to the Taco Cabana at Interstate 37 and Southcross and followed

Martinez's instructions about where to park. He testified Martinez got out of the van and walked away.

Dalton testified Martinez "blew up" his phone that night and then showed up at his apartment late that night and again the next day. He testified Martinez had Carter's phone with him and admitted he had shot her in the head. Martinez later told Dalton he had destroyed the phone. Dalton denied knowing or having ever seen or communicated with Carter.

Detective Duke next asked Martinez to come in for a voluntary interview. Martinez agreed and Detective Duke interviewed him for about an hour and a half. The trial court denied Martinez's pretrial motion to suppress the video and audio recording of the interview. It was admitted into evidence and played for the jury. Martinez, a Hispanic male with facial hair, told Detective Duke he was twenty-eight years old and lived on Polydale. He confirmed he knew the victim, had sold heroin to her in the past, and that she frequently had a friend with her. He admitted having been in her car before and said he had seen her twice in January, but he could not remember the dates. He also admitted he knew Dalton, who details his vehicles, but he believed the victim did not know Dalton. Finally, he confirmed the unknown Verizon telephone number was his number. Martinez denied being at the scene of the murder, and he left the police station.

After Martinez left the station, Detective Duke applied for an arrest warrant. The arresting officers testified and played the dashboard video of Martinez's arrest in a white 2005 Ford F-150 pickup truck. Martinez consented to a search of the truck, where the officers found an empty pistol holster.

Detective Duke testified he was later able to corroborate much of Dalton's version of the events through the FBI's analysis of the cell phone data for the period immediately preceding and following the murder and from videos Detective Duke obtained from the Taco Cabana and Panda Express. After Dalton's interview, Detective Duke obtained a more detailed statement from Mills,

in which she described the parking area by the Panda Express where she and the victim would meet Martinez. Detective Duke realized that video surveillance cameras at the Taco Cabana and Panda Express, which were next to each other, would likely capture some of the same areas. Two SAPD detectives testified about their video extractions from Taco Cabana and Panda Express, and the videos were introduced into evidence and played for the jury. Both Dalton and Detective Duke testified about what was depicted in the videos.

FBI Special Agent Mark Sedwick testified he is a member of an FBI cellular analysis survey team and is certified as an expert in the analysis of historical call detail records. Agent Sedwick briefly explained how cell phones interact with cell towers when they are idle and when they make or receive texts and calls. He testified that with information regarding the location of towers and the detailed data from a service provider, he can determine the approximate area of a phone's location at the time a call was made.

Agent Sedwick testified he was given records of three cell phones—the AT&T phones belonging to Carter and Dalton and the Verizon phone records of Martinez—and was asked to do an analysis of the activity and location of the three phones for the period from 6:00 p.m. to 7:30 p.m. on January 11, 2015, the night of the murder. He obtained the addresses of the Taco Cabana and Panda Express, the crime scene, and Martinez's home, and obtained the locations of every Verizon and AT&T cell tower in the area in January 2015. He plotted these locations onto a map using mapping software. Then he studied the call records and plotted the cell tower and sector usage of each phone on the map. Agent Sedwick produced an exhibit that included five maps that depicted, over the ninety-minute period, the communications among these phones, the cell site activations of each phone, a general indication of the coverage areas of the activated tower sectors, and the relative locations of those towers and the crime scene, Taco Cabana, and Martinez's home. Agent Sedwick testified in detail about what the data showed had occurred during those ninety

minutes. He concluded the historical cell site data placed Martinez in the area of the murder at the time of the murder.

Agent Sedwick testified he had access to two weeks of data for Carter's and Dalton's phones and did not find any communication or attempted communication between them. Agent Sedwick testified he also did a "tower analysis" of the data for Martinez's phone. A tower analysis looks at the historical cell site data for a phone to determine which cell tower the phone used most often during a particular period of time. Agent Sedwick testified he analyzed Martinez's cell phone records for the period of November 17, 2014 through January 13, 2015. During that time, there were 1,829 calls, and 1,063 of them, or 58%, used one sector of one specific tower—the tower that covers his home address. During the same period, the phone used the tower and sector that covered the crime scene area only five times—four times between 6:45 p.m. and 6:50 p.m. on January 11, 2015, and once about a month earlier.

Based on Agent Sedwick's testimony, the videos from Taco Cabana and Panda Express, and Dalton's and Detective Duke's testimony about the videos, the jury could have reasonably inferred the following timeline for the night of the victim's murder. She and Martinez had text and telephone communications with each other at 6:10 p.m. and 6:18 p.m. At that time, her phone activated a cell tower that covers an area northwest of the Taco Cabana, and Martinez was using a cell tower that covers an area southeast of the Taco Cabana. During that period of time, Martinez and Dalton had several conversations, and Dalton's phone alternated between two AT&T cell towers to the southeast of the Taco Cabana that had overlapping coverage.

At 6:22 p.m., Martinez's phone had moved to an area within the footprint of a Verizon tower that also included Taco Cabana and Panda Express. At that same time, the Panda Express video shows a white Ford F-150 truck pulling in and driving toward the area. At 6:25 p.m., Martinez texted Dalton. Four minutes later, the Panda Express video shows Carter's car pull in

and travel towards the parking area, in the same direction the white Ford F-150 had gone. One minute later, the video shows the car traveling back in the other direction. The truck is not seen leaving.

Dalton's phone continued to connect to the same two AT&T towers southeast of the Taco Cabana that it had been using earlier until 6:38 p.m. After that, all three phones activated towers that had the crime scene in their coverage areas. The last activity Carter's phone had with a cell tower was at 6:45 p.m., when it activated an AT&T tower that covers an area that includes the crime scene. There were multiple texts and calls between Martinez and Dalton from 6:45 p.m. and 6:50 p.m. Dalton's phone used two different cell towers with overlapping coverage, both of which included the crime scene. And all four of Martinez's calls during that period had activated the same sector of a cell tower that had the crime scene within its coverage area. Martinez's call to Dalton at 6:50 p.m. lasted two-and-one-half minutes. Police were dispatched to the scene at 6:51 p.m., after the 911 call.

There were no communications between Dalton's and Martinez's phones for almost thirty minutes after the murder. At 7:02 p.m., eleven minutes after the 911 call, Dalton's van is seen on the Taco Cabana video pulling into the parking lot. This is consistent with Detective Duke's testimony detailing he drove the route Dalton had described to him and, factoring in a two-minute stop at Martinez's house, it took ten minutes to drive from the crime scene to Taco Cabana. One minute later, the Panda Express video shows a person in a dark hoodie walking past the camera toward the parking lot where the white Ford truck had gone earlier. Dalton testified the person in the hoodie was Martinez, who is seen getting out of Dalton's van and walking to his truck. Less than a minute later, at 7:04 p.m., the Panda Express video shows a white Ford truck drive into the frame from the direction of the parking lot; and at 7:05 p.m., the Taco Cabana video picks up the same truck leaving.

Based on the foregoing evidence, the jury found Martinez guilty of murder. In the punishment phase, the State proved Martinez had a prior felony conviction for possession of a prohibited firearm and a prior juvenile adjudication for conduct constituting the offense of robbery. The victim's mother and sister and one of Martinez's sisters testified. The jury sentenced Martinez to life in prison and assessed a fine of $10,000. Martinez perfected this appeal.

### THE MOTION FOR CONTINUANCE

In his first issue, Martinez argues the trial court abused its discretion in denying his motion for continuance and in denying his motion for new trial based on the denial of the continuance. We conclude Martinez has failed to show actual prejudice resulting from the trial court's rulings.

Martinez filed the motion for continuance on Monday, August 5, 2019, the date trial was to begin. The motion asserted that on Saturday, two days before trial, the State had provided defense counsel a disclosure pursuant to *Brady v. Maryland* that required investigation. The relevant part of the State's written disclosure stated:

> I met with Gregory Dalton on August 2, 2019, and he told me that about two months before Laura Carter was murdered, Dalton's step-father got into a fight with Dalton's mother's live in nurse, and pulled a gun on her. After pulling the gun, Dalton's step-father put the gun away in a cabinet and forgot about it. Dalton's step-father later blamed the nurse for stealing the gun, but he had forgotten that he put it in the cabinet. After this, Dalton went and retrieved the gun and either gave it to Miguel Martinez, sold it to Miguel Martinez, or traded [it] to Miguel Martinez for drugs. I was not clear on it and he was not clear on it either. This transaction would have occurred about a month before Laura Carter was murdered. Dalton says he never saw the gun again after he gave it too [sic] Miguel. He doesn't know what type of gun it was and couldn't even describe it as a revolver or an automatic.

The sworn motion stated counsel required a continuance to investigate the circumstances surrounding the gun for purposes of exculpatory or impeachment material. The trial court heard argument on the motion before voir dire began.

The State advised the trial court that all the bullets recovered during the autopsy had been fired from the same weapon, a revolver, but that the murder weapon had not been found in the four

years since the victim's death. The trial court asked defense counsel what investigation he would conduct if a continuance were granted. Counsel responded that he did not want to disclose his strategy, but would do so "to the Court ex parte if you want me to." However, Martinez did not request an ex parte hearing and did not submit a sealed statement of counsel's proposed investigation or other reasons for seeking a continuance. The trial court denied the motion.

Martinez raised the denial of the motion for continuance as a ground in his motion for new trial. Counsel's affidavit stated the denial of the continuance prevented him from being able to "search federal databases for information related to the weapon and local firearms dealers for any in-store records of a purchase by the step-father in order to determine the make and model of the weapon." In addition, he was unable to interview Dalton's stepfather or the live-in nurse, or to investigate to either corroborate or disprove Dalton's statement. Counsel argued, as he does on appeal, that investigation of the information in the *Brady* notice was critical because it could either place a weapon of the same type used in the murder in Dalton's hands or, if the statement were proven untrue, impeach Dalton's credibility.

Dalton's stepfather testified at an evidentiary hearing on the motion for new trial. He denied that any of the events relayed in the *Brady* memorandum ever occurred. He denied he and his late wife ever had a live-in nurse and denied ever threatening his wife's caregiver. He testified he owns guns and probably had one during the period of time before the murder; and if so, it would have been a .380 or 9mm automatic, not a revolver. He testified he had always owned automatics and did not recall ever owning a revolver. Finally, he testified that in his opinion, Dalton is not a truthful person.

The prosecutor pro tem and Martinez's attorney stipulated that neither attorney had been able to obtain access to the federal database of firearm purchases to ascertain what types of firearms

Dalton's stepfather might have purchased. Martinez did not present evidence of any investigation of in-store records. The trial court denied the motion for new trial.

To show reversible error predicated on the denial of a pretrial motion for continuance, Martinez must show both that the trial court abused its discretion in denying the motion and that the lack of a continuance resulted in actual prejudice. *See Gonzales v. State*, 304 S.W.3d 838, 842-43 (Tex. Crim. App. 2010); *Heiselbetz v. State*, 906 S.W.2d 500, 511 (Tex. Crim. App. 1995).

In his brief, Martinez asserts the inability to investigate *could have had* a significant impact on the trial because it could have shown that Dalton had physical possession of the type of weapon used in the murder. However, the State established at trial that the murder was committed with a revolver, and Dalton's stepfather testified at the new trial hearing he had not owned a revolver. Martinez did not show that additional investigation would have yielded any contrary evidence. That counsel did not have time to investigate records or interview witnesses for potential mitigating evidence without any showing of a specific prejudice fails to establish error. *See Heiselbetz*, 906 S.W.2d at 512; *Franks v. State*, 90 S.W.3d 771, 808 (Tex. App.—Fort Worth 2002, no pet.).

Martinez also contends the denial of a continuance deprived him of the ability to interview Dalton's stepfather and thus discover the impeachment value of his testimony. However, a trial court does not abuse its discretion by denying a continuance to allow a party to discover impeachment evidence. *See Keel v. State*, 434 S.W.2d 687, 689 (Tex. Crim. App. 1968); *Franks*, 90 S.W.3d at 808. And a trial court does not abuse its discretion in denying a motion for new trial because of newly discovered evidence that is "merely cumulative, corroborative, collateral, or impeaching." *Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003). The only relevance of the stepfather's testimony would have been to show that Dalton lied to prosecutors in the statement he made to them several days before trial. However, Dalton was repeatedly impeached

at trial, with Detective Duke readily admitting Dalton "is, in fact, a liar." The stepfather's testimony would have been merely impeaching and cumulative. Martinez has not established any specific prejudice to his case arising from the trial court's decision to not continue the trial, and therefore has not shown an abuse of the trial court's discretion in either denying the motion for continuance or denying the motion for new trial.

## MOTION TO SUPPRESS CELL PHONE RECORDS

In his second issue, Martinez contends the trial court erred in denying his motion to suppress cell phone records, which he argues were obtained in violation of his Fourth Amendment rights.[2]

### A. Evidence

In the first days following the murder, Detective Duke met with the victim's family and friends to determine the names of those with whom she had been in contact. They reviewed a printout of her call log, but her family and friends were not able to identify the owner of one number with which she had been in contact multiple times the day of her murder. Detective Duke was only able to ascertain that it was a Verizon telephone number.

On January 14, 2015, Detective Duke applied for and was granted a search warrant for cellular telephone data assigned to the Verizon telephone number. The warrant ordered the search and seizure of three specific categories of information: (1) information identifying the person who held the account assigned to the unknown telephone number; (2) logs of communications to and from the unknown number for the period of November 1, 2014 through January 14, 2015; and (3) historical tower data for the unknown number for the period of November 1, 2014 through January 14, 2015.

---

[2] Several times in his brief, Martinez refers to a search of his cell phone. The record does not reflect there was any search of his cell phone.

Detective Duke received a return on the warrant on January 18, 2015. The return identified the Verizon telephone number as assigned to TracFone Wireless and did not identify the owner of the device to which the number was assigned. Both Dalton and Martinez later confirmed the number was Martinez's.

Martinez urged an oral motion[3] to suppress all the data obtained pursuant to the warrant. He argued the search warrant was overbroad and not supported by probable cause. The trial court denied the motion. At the beginning of trial, Martinez objected "on the basis of the search warrant" to the State's offer of fifty-four pages of Martinez's cell phone data provided by Verizon, covering the period from November 17, 2014 through January 14, 2015. The trial court overruled the objection and gave Martinez a running objection to testimony about Martinez's phone records. The trial court did not make any findings of fact.

On appeal, Martinez argues all his cell phone data should have been suppressed because the State violated the Fourth Amendment when it searched and seized his cell phone records on the authority of a warrant that was general, overbroad, and not supported by probable cause.

### B.  Standard of Review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress, "giving almost total deference to the historical facts found by the trial court and analyzing *de novo* the trial court's application of the law." *State v. Cuong Pu Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015). When appellant challenges a determination of probable cause, our standard of review is highly deferential because of the constitutional preference for searches conducted by way of warrants. *Id.* "When in doubt, [we] should defer to all reasonable inferences that the magistrate

---

[3] Martinez filed several pretrial written motions to suppress; however, all of them sought suppression of Martinez's statements or evidence obtained as a result of his arrest. None of the written motions in the record before us sought to suppress the fruits of any search before Martinez's arrest or to suppress the data obtained from Martinez's cell phone provider.

could have made." *Bonds v. State*, 403 S.W.3d 867, 873 (Tex. Crim. App. 2013); *see Jones v. State*, 364 S.W.3d 854, 857 (Tex. Crim. App. 2012) ("'[T]he magistrate's decision should carry the day in doubtful or marginal cases, even if the reviewing court might reach a different result upon *de novo* review.'") (quoting *Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010)). The test is whether the trial court had a substantial basis for concluding the search would uncover evidence of wrongdoing. *See Bonds*, 403 S.W.3d at 873. We must uphold the trial court's ruling on the motion to suppress on any legal theory applicable to the case that is supported by the record, even if it was not presented to the trial court or briefed on appeal. *See State v. Esparza*, 413 S.W.3d 81, 85-86 (Tex. Crim. App. 2013).

### C. Subscriber Information and Call Logs

"The threshold issue in every Fourth Amendment analysis is whether a particular government action constitutes a 'search' or 'seizure' within the meaning of the Amendment." *Sims v. State*, 569 S.W.3d 634, 643 (Tex. Crim. App. 2019). For there to be a Fourth Amendment violation, the defendant must show he has a reasonable expectation of privacy in the information obtained. *See id.*; *see generally Carpenter v. United States*, 138 S. Ct. 2206, 2219 (2018).

The return in this case did not provide any subscriber information, and Martinez has not provided any argument or authority that he has a reasonable expectation of privacy in the subscription information he might give a cell service provider. *See Ex parte Jones*, 473 S.W.3d 850, 854-55 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (holding there is no reasonable expectation of privacy in subscription information voluntarily given to internet provider and information is not protected by Fourth Amendment). It is also settled that pursuant to the third-party doctrine, there is not a reasonable expectation of privacy protected by the Fourth Amendment in the numbers a person texts or calls. *See Smith v. Maryland*, 442 U.S. 735, 744-45 (1979); *see also Carpenter*, 138 S. Ct. at 2220 (stating Court was not "disturb[ing] the application" of *Smith*);

*Hankston v. State*, 582 S.W.3d 278, 280 n.3 (Tex. Crim. App. 2019) (stating call logs obtained without warrant "were properly admitted").

Accordingly, the State's acquisition of the call logs and subscriber information for Martinez's phone was not a search and seizure for which the Fourth Amendment requires a warrant supported by probable cause. The trial court therefore did not err in denying the motion to suppress the subscription information and call logs the State obtained from Verizon.

## D. Historical Cell Site Data

In *Carpenter v. United States*, the United States Supreme Court held an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through historical cell site data and that "accessing seven days of CSLI[4] constitutes a Fourth Amendment search." 138 S. Ct. at 2217 n.3. Consequently, Fourth Amendment protections generally require the State to obtain a warrant supported by probable cause before acquiring such records. *Id.* at 2221.

Martinez contends on appeal that the search warrant for his cell phone records was general, overbroad, and not supported by probable cause. It therefore violated the Fourth Amendment and the evidence obtained with the warrant should have been suppressed. Martinez's brief on this issue does not contain any argument that the search and seizure of the historical cell site data violated the Texas Constitution or that exclusion of the evidence was required by Article 38.23(a) of the Texas Code of Criminal Procedure. We therefore review only whether the search and seizure of the historical cell site data for Martinez's cell phone violated the Fourth Amendment.

---

[4] The opinion in *Carpenter* and recent case law refer to the records of when and where and how a cell phone connects to a cell site as "cell site location information" or CSLI. The documents and witnesses in this case referred to the same type of data as "historical cell site data" or "historical tower data" and we use the phrases as they appear in our record.

Martinez first contends the search warrant was impermissibly general because it failed to describe the things to be seized with sufficient particularity to avoid the possibility of a general search. *See Groh v. Ramirez*, 540 U.S. 551, 561 (2004); *Thacker v. State*, 889 S.W.2d 380, 389 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd). We disagree. The affidavit and warrant both specifically identified the types or categories of data held by Verizon to be searched and seized, including, specifically, the historical tower data for a specific cell phone number for a specific period of time. We conclude the warrant was not impermissibly general. *See Diaz v. State*, 604 S.W.3d 595, 605-06 (Tex. App.—Houston [14th Dist.] 2020), *aff'd*, 632 S.W.3d 889 (Tex. Crim. App. 2021).

Martinez next contends the warrant was not supported by probable cause. Under the Fourth Amendment, probable cause to support the issuance of a search warrant exists when the facts and circumstances submitted to the magistrate justify a conclusion that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "The test is not whether the warrant affidavit proves beyond a reasonable doubt, or even by a preponderance of the evidence, that a search of the listed location would yield a particular item of evidence; a 'fair probability' will suffice." *Foreman v. State*, 613 S.W.3d 160, 163 (Tex. Crim. App. 2020), *cert. denied*, 141 S. Ct. 2632 (2021) (internal quotation marks omitted). The warrant affidavit should not be read with "hyper-technical exactitude," and "[w]hile a magistrate may not baselessly presume facts that the affidavit does not support, the magistrate is permitted to make reasonable inferences from the facts contained within the affidavit's four corners." *Id.* at 163-64 (internal quotation marks omitted). "Ultimately, the test is whether the affidavit, read in a commonsensical and realistic manner and afforded all reasonable inferences from the facts contained within, provided the magistrate with a substantial basis for the issuance of a warrant." *Id.* at 164 (internal quotation marks omitted). Because we seek to encourage police

officers to use the warrant process, we apply this "flexible and nondemanding" standard, giving great deference to a magistrate's determination of probable cause, even in "close cases." *Id.* (internal quotation marks omitted).

The affidavit established that on January 11, 2015, thirty-three-year-old Laura Carter was shot multiple times in the head and her death was ruled a homicide. The SAPD had an open case it was investigating as a murder. The affiant, a detective with the SAPD, stated he had reviewed Carter's cell phone records and discovered she had communicated multiple times with a person using a specified cell phone number during the last hours and minutes of her life. He stated the last communication her phone had with the specified cell phone number was just minutes before she was murdered. The affiant stated he had reviewed these cell phone records with her family and with many of her friends, and none of them were able to identify to whom the specified cell phone number belonged. He stated he believed the information sought—the identity of the owner of the specified cell phone number, the call logs, and the historical cell site data for the device—would provide evidence of the murder, including the identity and location of the suspect at the time of the murder. The magistrate could have reasonably inferred that a person whose telephone number was unknown to any of the victim's family or friends and who had multiple communications with her shortly before her death was likely involved in her murder in some way. The magistrate could have also reasonably concluded there was a fair probability that the location of the device involved in those communications would provide evidence of the crime in the investigation of the murder described in the affidavit.

We conclude the magistrate had a substantial basis for concluding probable cause existed to conduct the search and seizure of historical cell site data for the hours surrounding the murder. *See Diaz*, 604 S.W.3d at 603, 606 (probable cause supported warrant to search categories of data in cell phone, including stored GPS data where affidavit included facts that cell phone was used

during the crime or shortly before or after the crime and provided reason to believe search was likely to produce evidence in the investigation); *Walker v. State*, 494 S.W.3d 905, 908-09 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (probable cause found to search cell phone where suspect in a capital murder case exchanged numerous text messages and phone calls with complainant around time of shooting). However, the affidavit did not provide a sufficient basis to search and seize the historic cell site data for the seventy-four-day period covered by the warrant.

### E. Good Faith

We nevertheless conclude the trial court did not err in denying the motion to suppress the cell tower data evidence for the seventy-four day period because law enforcement officials obtained the evidence in good faith reliance on a warrant.

Because Martinez did not challenge the admissibility of the historical cell site data under the Texas exclusionary rule either in the trial court or in his brief, and the argument in his brief on this issue relies solely on the Fourth Amendment, we confine our analysis to the Fourth Amendment, and we apply the federal exclusionary rule. *See Manns v. State*, 122 S.W.3d 171, 192 n.97 (Tex. Crim. App. 2003); *Day v. State*, No. 11-14-00366-CR, 2016 WL 6395420, at *3 (Tex. App.—Eastland Oct. 27, 2016, no pet.) (mem. op., not designated for publication).

Under the judicially created federal exclusionary rule, the suppression of evidence is not the appropriate remedy for every Fourth Amendment violation. *See United States v. Leon*, 468 U.S. 897, 906-07, 920-23 (1984). Rather, the exclusion of evidence is a court's "last resort, not [its] first impulse." *Herring v. United States*, 555 U.S. 135, 140 (2009) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). The sole purpose of the exclusionary rule is to deter future Fourth Amendment violations, and that purpose is not furthered by suppressing evidence law enforcement officers obtained in objectively reasonable reliance on a subsequently invalidated search warrant. *Leon*, 468 U.S. at 919-22. The good faith exception therefore "bars the application

of the exclusionary rule to exclude evidence obtained pursuant to a warrant if law enforcement officers act under an objectively reasonable, good faith belief that the search warrant in question is valid—even if it, in fact, is not." *United States v. Jarman*, 847 F.3d 259, 264 (5th Cir. 2017).

"[O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23. In making this determination, all the circumstances surrounding issuance of the warrant may be considered. *Id.*; *see also United States v. Woerner*, 709 F.3d 527, 533-34 (5th Cir. 2013) (listing circumstances in which reliance on warrant is not objectively reasonable). The record in this case does not present any circumstances suggesting that reliance on the warrant was objectively unreasonable. Notably, at the time the warrant in this case was applied for, issued, and executed, neither Texas courts nor the Fifth Circuit recognized a reasonable expectation of privacy in the historical cell site location data obtained from the records of a cell phone service provider, and no warrant was required to obtain it. *See In re United States for Historical Cell Site Data*, 724 F.3d 600, 610 (5th Cir. 2013); *Ford v. State*, 444 S.W.3d 171, 186-190 (Tex. App.—San Antonio 2014), *aff'd* 477 S.W.3d 321 (Tex. Crim. App. 2015). Nevertheless, Detective Duke applied for a warrant; a neutral magistrate issued the warrant; the warrant was technically sufficient and listed the specific dates and categories of information to be searched and seized. We therefore hold the trial court did not err in denying the motion to suppress the historical cell site data for the seventy-four day period because it was obtained in good faith reliance on a warrant.

## F. Any Error Harmless Beyond a Reasonable Doubt

Alternatively, if the federal exclusionary rule and its exceptions do not apply here, we nevertheless hold there is no reversible error because the records of the historical cell site data for the periods other than that for which there was probable cause (the hours just before and after the

murder) were severable from the rest of the records, and the trial court's failure to suppress the improperly seized historical cell site records was harmless beyond a reasonable doubt.

Because the warrant in this case "was not 'essentially general,' the appropriate remedy . . . 'is not to suppress the fruits of the entire warrant but to strike the offending clauses and exclude evidence that does not fit within the warrant as modified.'" *Ramos v. State*, 934 S.W.2d 358, 363 & n.7 (Tex. Crim. App. 1996) (citing *Walthall v. State*, 594 S.W.2d 74, 79 (Tex. Crim. App. 1980)); *see also Diaz*, 604 S.W.3d at 605-06 (stating warrant that permits search of cell phones for specific types of records satisfies Fourth Amendment particularity requirement and is not essentially general). As discussed above, no warrant was required for the subscription information and call logs, and there was probable cause for a warrant for the cell tower data for the time period immediately before and after the murder. The "offending" part of the warrant was that which authorized seizure of Martinez's historical cell site data for any time period, other than the hours before and after the murder.

After severing the improperly seized historical cell site data, we must determine whether the trial court's error in failing to suppress it was reversible. *See Walthall*, 594 S.W.2d at 79-80. Because any error was of constitutional magnitude, we review it pursuant to Rule 44.2(a) of the Texas Rules of Appellate Procedure and we must reverse the judgment unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a). This requires us to evaluate the entire record in a neutral manner to determine whether there is a "reasonable possibility" that the error might have contributed to the conviction. *Love v. State*, 543 S.W.3d 835, 846 (Tex. Crim. App. 2016) (quoting *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g)). "Our analysis should not focus on the propriety of the trial's outcome; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence." *Id.* We consider "every circumstance apparent in

the record that logically informs a determination whether, beyond a reasonable doubt, this particular error contributed to the conviction or punishment." *Id.* This includes, if applicable, the nature of the error, the extent to which the State emphasized it, its probable collateral implications, and the weight a juror would probably place on the error. *Snowden v. State*, 353 S.W.3d 815, 820 (Tex. Crim. App. 2011).

The warrant authorized the search and seizure of historical cell site data for the Verizon telephone number for the period November 17, 2014 through January 14, 2015. State's Exhibit 1, which was admitted into evidence before testimony began, contains fifty-four pages of records from Verizon. The records consist of detailed raw data about communications to and from that cell phone. Nothing in the exhibit and no testimony at trial attempts to explain how to interpret the data. *See Olivas v. State*, No. 02-14-00412-CR, 2020 WL 827144, at *5 n.9 (Tex. App.—Fort Worth Feb. 20, 2020, pet. ref'd) (mem. op., not designated for publication) ("CSLI data . . . was useless outside of [the agent's] interpretive testimony as it consisted of multiple data points and coded cell locations that are not subject to common knowledge").

The historical cell site data in Exhibit 1 was referred to during trial only by Agent Sedwick, who stated he received the records in Exhibit 1 to conduct his analysis. Almost all of his testimony, his demonstrative exhibit, and his report that was admitted into evidence concerned only his analysis of the data during the period from 6:00 p.m. to 7:30 p.m. on January 11, 2015, the night of the murder. As we concluded above, there was probable cause to issue a warrant for the historical cell site data for that period of time.

The only evidence at trial relating to the historical cell site data that should have been suppressed was Agent Sedwick's testimony about conducting a tower analysis of Martinez's calls for the timeframe outside the immediate hours surrounding the murder. That analysis disclosed that a majority of Martinez's calls during the period covered by the records used a specific sector

of a specific Verizon tower near Martinez's home. There was nothing unusual or surprising about this testimony, it did not bear on the issues in the case, and it was not mentioned at any other time in the trial. Agent Sedwick's tower analysis also disclosed that, during the period covered by the records, Martinez's phone used the tower that it accessed at the time of the murder only one other time, about a month earlier. The prosecutor briefly referred to this evidence twice in his closing to suggest Martinez might have gone to the location a month before the murder to "case" the location.

The State's case is about the details that formed the relationship between the victim and Martinez, and is firmly supported by Mills' testimony, the videos at the place they habitually met, the call logs and cell site data from the night of the murder, the circumstances in which she was found, and Dalton's testimony. The evidence showing Martinez's phone activated the cell tower near the murder scene one time a month before the murder does not relate to any element the State was required to prove and, at most only "incrementally" improved the jury's reason to believe the State's other evidence. *See Dixon v. State*, 595 S.W.3d 216, 220 (Tex. Crim. App. 2020); *Olivas*, 2020 WL 827144, at *5-*6. The evidentiary value of the evidence was minimal and it certainly was "not a significant pillar of the State's case." *See Dixon*, 595 S.W.3d at 220. We conclude that any error in failing to suppress the historical cell site data that should not have been included in the warrant was harmless beyond a reasonable doubt.

### DENIAL OF JURY CHARGE ON VOLUNTARINESS OF STATEMENT

In his third and final issue, Martinez contends the trial court erred by denying a request for a jury instruction regarding the voluntariness of his statement. We hold no error has been shown.

After Detective Duke identified Martinez as the owner of the Verizon telephone number that had been in contact with Carter in the hour before her murder, the detective asked Martinez if he would go to police headquarters for an interview. Martinez agreed. The interview was recorded, and when it was over, Martinez was allowed to leave.

Martinez filed pretrial motions to determine the voluntariness and admissibility of the statements made in the recorded interview and requested a *Jackson v. Denno* hearing. After a hearing on July 2, 2019, the trial court denied the motion to suppress Martinez's statements and issued written findings of fact and conclusions of law. The trial court found, among other things, that Martinez voluntarily drove his own vehicle, unaccompanied, to police headquarters; the entire exchange was recorded; he was not given *Miranda* warnings; he was free to leave at any time; Martinez did not at any time request the presence of an attorney; and "there was no evidence of coercion either in the oral evidence presented or in the recorded statement." The trial court concluded Martinez was not in custody, and the statement was freely and voluntarily given. The State offered the video recording of Martinez's statement into evidence at trial. In objecting, Martinez's counsel stated only, "the Court will note our previous objections at the *Jackson v. Denno*." The trial court overruled the objection, and the recording was played for the jury. No record of the *Jackson v. Denno* hearing has been filed in this court, and Martinez has not challenged the trial court's findings and conclusions or its ruling on the admissibility of the recorded statement.

At the charge conference, Martinez requested an instruction on the voluntariness of the recorded statement. The trial court denied the request, and Martinez complains in his third issue that the trial court erred.

Neither Martinez's request for a jury instruction in the trial court nor his brief on appeal specify what type of voluntariness instruction he believes should have been given. *See Oursbourn v. State*, 259 S.W.3d 159, 173-78 (Tex. Crim. App. 2008) (discussing various types of voluntariness instructions that may be submitted to the jury). In his brief, Martinez cites statutes and caselaw that authorize or require submission of an instruction under various circumstances;

however, he makes no attempt to explain why or how any of those circumstances apply in this case.

We conclude the evidence did not raise an issue that required submission of a voluntariness instruction. Initially, the undisputed evidence at trial showed Martinez was not in custody when he was interviewed; he was thus not entitled to *Miranda* or Texas statutory warnings and was not entitled to an instruction under Article 38.22 § 7 of the Texas Code of Criminal Procedure. *See Estrada v. State*, 313 S.W.3d 274, 300 (Tex. Crim. App. 2010); *Oursbourn*, 259 S.W.3d at 171-72, 176. In order to trigger the trial court's duty to issue an Article 38.23 (exclusionary rule) instruction, "[t]he defendant must offer evidence that, if credited, would create a reasonable doubt as to a specific factual matter essential to the voluntariness of the statement." *Oursbourn*, 259 S.W.3d at 177. "[T]he contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the statement claimed to be involuntary." *Id.* Martinez has not identified or argued there was any unlawful conduct in obtaining Martinez's statement. Finally, Martinez was not entitled to an Article 38.22 § 6 voluntariness instruction because "no 'reasonable jury could find that the facts, disputed or undisputed, rendered him unable to make a voluntary statement.'" *Estrada*, 313 S.W.3d at 299-300 (quoting *Oursbourn*, 259 S.W.3d at 176). The trial court did not err in failing to instruct the jury because no fact issue that raised either a "state-law claim of involuntariness" or a "federal constitutional (police-coercion) claim of involuntariness" was litigated before the jury. *See Estrada*, 313 S.W.3d at 300; *Oursbourn*, 259 S.W.3d at 172–73 (describing circumstances that raise these state-law and federal constitutional claims).

## CONCLUSION

We overrule each of Martinez's points and we affirm the trial court's judgment.

Luz Elena D. Chapa, Justice

PUBLISH